Jeffrey S. Lawson (SBN 99855)
Edward A. Kraus (SBN 162043)
SILICON VALLEY LAW GROUP
One North Market Street, Suite 200
San Jose, CA  95113
(408) 573-5700
Fax (408) 573-5701
jsl@svlg.com
ekraus@svlg.com

Attorneys for
Sharks Sports & Entertainment LLC

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| SHARKS SPORTS & ENTERTAINMENT LLC,<br><br>Plaintiff,<br><br>vs.<br><br>FEDERAL TRANSIT ADMINISTRATION; K. JANE WILLIAMS, in her official capacity as Acting Administrator; EDWARD CARRANZA JR., in his official capacity as Acting Regional Administrator; Federal Transit Administration Region IX Office; and ELAINE L. CHAO, in her official capacity as Secretary, United States Department of Transportation,<br><br>Defendants. | Case No.:<br><br>COMPLAINT FOR INJUNCTIVE RELIEF<br><br><br><br><br><br><br><br><br>Exhibits:<br><br>  A.  FOIA Request<br>  B.  FTA Response to FOIA Request<br>  C.  Administrative Appeal<br>  D.  FTA Final Action |

## **COMPLAINT FOR INJUNCTIVE RELIEF**

Plaintiff Sharks Sports & Entertainment LLC alleges as follows:

## **INTRODUCTION**

1. This is an action under the Freedom of Information Act ("FOIA"), 5 U.S.C. Section 552, for injunctive and other appropriate relief.  Plaintiff, Sharks Sports &

Entertainment LLC ("SSE") seeks to compel compliance with FOIA.  SSE seeks information regarding the decision by the Federal Transit Administration ("FTA") to eliminate parking for BART riders at the proposed San Jose Diridon BART Station that will be constructed as part of the Santa Clara Valley Transportation Authority's ("VTA") BART Phase II Extension Project ("Project").

**PARTIES**

2. Plaintiff SSE is a Delaware limited liability company registered to do business in California with its principal place of business in Santa Clara County.  Through its subsidiary San Jose Sharks, LLC, SSE owns and operates the San Jose Sharks professional ice hockey team, a member of the National Hockey League.  SSE is also the parent company of San Jose Arena Management, LLC, the manager of the SAP Center ("Arena"), which is located in downtown San Jose adjacent to BART's planned Diridon Station under Santa Clara Street.

3. Defendant FTA is an agency of the federal government of the United States within the meaning of 5 U.S.C. Section 552(f)(1).  FTA'S headquarters is in Washington D.C. and has offices all over the country, including in San Francisco, California.

**JURISDICTION AND VENUE**

4. The Court has subject matter jurisdiction over the action and personal jurisdiction over the parties pursuant to 5 U.S.C. Sections 552(a)(4)(B) and 552(a)(6)(C)(i). This Court also has jurisdiction over the action pursuant to 28 U.S.C. Sections 1331 and 1436 and 5 U.S.C. Section 701-706.

5. Venue is proper in this district under 5 U.S.C. Section 552(a)(4)(B), and 28 U.S.C. Sections 1391(e) and 1402.  Plaintiff SSE has its principal place of business in this district and the Project is located in the District.

6. Assignment to the San Jose Division is proper pursuant to Local Rule 3-2(c) and (d) because; (1) A substantial portion of the events giving rise to this action occurred in Santa Clara County, (2) This is where Plaintiff SSE's principal place of business is located, and, (3) The BART Project at issue underlying the FOIA request is being built within this Division.

///

---

COMPLAINT FOR INJUNCTIVE RELIEF UNDER FOIA

2

10524820.DOCX

# FACTUAL ALLEGATIONS

7. In a Record of Decision ("ROD") dated June 4, 2018, the FTA announced its decision that the environmental requirements had been satisfied for the Project, which is part of the BART Silicon Valley Program. That Program consists of the extension of the BART system from Fremont into Santa Clara County through Milpitas, San Jose, and Santa Clara. The BART Silicon Valley Program is being implemented in two phases: The Phase I Berryessa Extension Project and the Project. The Phase I Project to Berryessa is not yet completed and is now tentatively rescheduled to become operational in 2019 though that completion date is subject to being moved yet again.

8. The remaining 6 miles of the BART Silicon Valley Program is the Project. The Project consists of the extension of the BART system from the Berryessa/North San Jose Station through downtown San Jose in an approximately 5-mile-long tunnel, mostly under Santa Clara Street, terminating near the Santa Clara Caltrain Station.

9. The most important planned station on the Phase II Project route is the BART Diridon Station, which will interconnect several transit modes, including: BART, Caltrain, light rail, the bus system, private vehicles, the Altamont Express, Amtrak (Capitol Corridor and Coast Starlight), and the planned High-Speed Rail ("HSR"). Diridon Station is projected to be the biggest intermodal station in the West.

10. The Arena is an 18,000-seat regional multipurpose event center located adjacent to the planned BART Diridon Station. With over 170 events per year, the Arena is one of San Jose's most consistent and impactful economic catalysts and a critical asset to the City's economic success. The Arena's operations support over 5,000 full time equivalent jobs, generate more than $250 million in annual economic impact, and provide millions of dollars in revenue for San Jose.

11. As a regional event center, the Arena attracts more than 1.5 million people to San Jose's downtown area every year, drawing a diverse crowd from throughout Santa Clara, San Mateo, Santa Cruz, and Alameda counties, and beyond. The region from which the Arena draws is primarily suburban, and mass transit is not a viable option for the majority of the

1  Arena's patrons. Accordingly, the Arena is reliant on a large supply of convenient parking nearby, as well as highly functional and efficient ingress and egress from all modes of transportation. One of the reasons the Arena was built in its present location is because of its excellent access to major highways and large surface streets.

12. Automobiles are the primary means of transportation in the South Bay, which includes the counties of Santa Clara, San Mateo, Santa Cruz, and Alameda. In fact, the 2040 San Jose General Plan predicts that more than 20 years from now, 60% of all trips will still be by automobile. After approximately 20 years of light rail operation, the use of light rail to attend Arena events remains trivial. Surveys report that travel by Caltrain for Arena events is similarly insignificant. Experience shows that past predictions of mass transit use for Arena events have been grossly overestimated.

13. The Final Supplemental Environmental Impact Statement/Subsequent Environmental Impact Report and Draft Section 4(f) Evaluation, dated February 2018 ("Final SEIS/SEIR") for the Project is a joint environmental document by FTA and VTA that attempts compliance with both the federal National Environmental Protection Act ("NEPA") by virtue of the Supplemental Environmental Impact Statement ("SEIS") sections of the document, and the California Environmental Quality Act ("CEQA"), by virtue of the Subsequent Environmental Impact Report ("SEIR") sections of the document.

14. NEPA requires federal agencies undertaking any major federal action to review the environmental impacts of the proposed action and to "study, develop, and describe appropriate alternatives to recommended courses of action." 42 U.S.C. §4332(2)(C)(E). NEPA's purpose is two-fold: first, to ensure that federal agencies undertaking a major federal action will take a hard look at the proposed project's environmental impacts before deciding how to proceed, and, second, to ensure that relevant information about the impacts of a proposed project and its alternatives will be made available to members of the public, to provide a meaningful opportunity for public comment and participation in the federal decision-making process.

15. VTA is a special district responsible for public transit services, congestion management, specific highway improvement projects, and countywide transportation planning for Santa Clara County, California. It operates its own buses, light rail and other transit programs. Its Board is made up of mayors and councilmembers from the various cities in Santa Clara County and the Board of Supervisors.

16. The FTA "New Starts" program is part of the Capital Investments Grants (CIG) program. New Starts is the federal government's primary discretionary financial resource for supporting locally planned, constructed, implemented, and operated major transit projects that are requesting over $100,000,000.00. This program funds new commuter rail, light rail, heavy rail, and bus rapid transit projects, streetcars, and ferries, as well as extensions to existing transit systems in every area of the country.

17. New Starts projects undergo evaluation by the FTA throughout the entire project development process. Based on this evaluation, the FTA makes decisions about moving projects forward, from preliminary engineering to final design, and to the execution of a Full Funding Grant Agreement ("FFGA") to annual funding recommendations to Congress. The FFGA would be the multi-year contractual agreement between the FTA and VTA that formally defines the project scope, cost and schedule, and establishes the terms of federal financial assistance.

18. VTA submitted an application to enter into New Starts project development for Phase II in March 2016.  VTA must now complete a number of activities to obtain funding, which include: adoption into the region's long-range transportation plan, clearly defining the project description, completing activities for evaluation and rating, and completing the environmental review process.

19. The decision by FTA whether to enter into a FFGA is discretionary. Even if FTA decides to proceed with a FFGA agreement, FTA does not commit FFGA funding until after the project sponsor has demonstrated that its project is ready. The applicant proves it is ready for FFGA funding by FTA receiving assurance that; (a) the project's development, design scope, costs, benefits, and impacts are firm and final; (b) the project sponsor has obtained all non-CIG funding commitments; and (c) the project sponsor has completed all critical third-party

---

COMPLAINT FOR INJUNCTIVE RELIEF UNDER FOIA

5

10524820.DOCX

agreements. Under the CIG program, FTA establishes a maximum fixed CIG dollar grant upon entry into the Engineering phase. Thereafter, the project sponsor, [here that is VTA] assumes the risk for any cost overruns or funding shortfalls that may occur on a project. (See FTA Annual Report on Funding Recommendations, February 2018.
https://www.transit.dot.gov/sites/fta.dot.gov/files/docs/funding/grant-programs/capital-investments/69556/fy19-annual-report.pdf)

20. The Project is competing for New Starts money with Phoenix, AZ, Los Angeles, CA, Lake County, IN, St Paul, MN, Syracuse, NY, New York City, NY and Seattle, WA. (*Id*. at Table 2A.)

21. The Capital Investment Grants project evaluation and ratings are based on statute. Federal transportation law (49 U.S.C. §5309) establishes criteria on which proposed projects must be evaluated and specifies a five-point rating scale: High, Medium-High, Medium, Medium-Low, and Low. To advance in the process toward a funding recommendation in the President's budget and a construction grant agreement, a project must be rated Medium or better overall. Even when a project is recommended for funding, receipt of CIG program funding is only awarded once the project sponsor can assure FTA that the proposed project scope, cost estimate, and budget are firm and reliable, all funding commitments are in place, and all critical third-party agreements are completed. *Id*. at p. 7.

22. With regard to the parking at Diridon, all environmental documents related to the Project prior to the Final SEIS/SEIR (2004 Draft EIS/EIR for the 16-mile project, the 2009 Draft EIS, and the 2010 Final EIS) have relied upon actual, competent studies to determine the need for parking at the BART Diridon Station. Indeed, those previous studies determined that the BART Diridon Station was going to be a huge parking draw and that it would, absent mitigation, cause significant direct and indirect adverse environmental impacts throughout the downtown and Diridon areas-including the Arena operations. Not only were huge spillover parking problems anticipated, but also significant safety, access, and pollution issues that would negatively impact pedestrians, drivers, bicyclists, and businesses were also predicted. These prior environmental documents culminated in the proposal to construct an 8-story, 1,300 space

parking garage at BART Diridon Station, in order to provide critical (albeit only partial) mitigation of adverse impacts caused by the BART Project.

23. In December 2016, FTA released a Draft Supplemental Environmental Impact Statement/Subsequent Environmental Impact Report ("Draft SEIS/SEIR") that, without the benefit of any parking studies, eliminated all long-term parking mitigation, including the promised 8-story garage, which based upon the previous parking studies was a required part of the Project. The basis for this decision to eliminate BART related Diridon Station parking is a mystery for which no government official is taking responsibility. However, because of the timing of the removal in 2016, that decision had to have been made prior to the 2016 issuance of the Draft SEIS/SEIR.

24. Tellingly, the May 2015 Phase II Extension Project Scoping Report p. 4-3 listed considering a parking structure at Diridon Station within the list of "Key Issues." Yet the Draft SEIS/SEIR ignored the entire matter. This again indicates the decision to eliminate parking at Diridon station was taken prior to December 2016, and that it was done without any studies or public disclosure or discussion.

25. In addition to its failure to account for or mitigate the long-term parking impacts caused by the Phase II Project, the Project also will permanently eliminate 715 existing parking spaces in the Diridon Station area, which spaces are already required and fully utilized by Caltrain passengers, together with patrons and employees of the Arena, and other Diridon Station area businesses. The Final SEIS/SEIR does not provide for any replacement of those spaces. The basis for this decision is also a mystery.

26. The elimination of the parking at Diridon is enormously significant and a matter of substantial public interest. The public has a right to know under FOIA how the decisions reached by federal agencies are reached, particularly decisions that have major impacts on the City of San Jose and its inhabitants. Delay and stonewalling by an agency to prevent disclosure within a time period in which the information can be used frustrates the democratic principles which are the basis of FOIA.

27. The reasons for the mysterious removal of parking at Diridon Station are extremely important to the local community and SSE. FTA undoubtably has documents, including email communications with VTA, regarding the decision not to provide parking and the removal of a parking structure that had been part of the original plan for many years. FTA is refusing to produce these documents.

**FOIA Request to FTA and the Basis for the Withholding**

28. On March 15, 2018, SSE submitted a FOIA request to FTA seeking records relating to BART parking at the San Jose Diridon Station, from May 1, 2007 through February 21, 2018, including all of the following:

-correspondence between FTA and VTA.

-correspondence between FTA and its consultants

-correspondence between the FTA and the City of San Jose

-internal correspondence between FTA staff persons

-construction cost studies, memoranda or budgets

-parking surveys or parking studies.

A true and correct copy of that letter is attached hereto as **Exhibit A**.

29. SSE received in response a letter from FTA indicating that they are withholding documents based upon statutory privileges, without stating the categories or types of documents being withheld, or even the basis for withholding. In addition, FTA only produced a minimal number of documents created from 2016 through 2018, and those documents already existed in the public realm. The only documents provided were Traffic Impact Assessments, Tech Reports re: Transportation, FSEIS attachment documents related to NEPA and CEQA transportation operation analysis, NEPA alternative analysis of construction, scoping presentation and a December 2017 Diridon Parking Study. No documents were produced for the years 2007 through 2015. No emails between FTA and VTA were produced. And, no *Vaughn* Index was produced. A true and correct copy of FTA'S correspondence in response to SSE's FOIA request is attached hereto as **Exhibit B.**

---

COMPLAINT FOR INJUNCTIVE RELIEF UNDER FOIA
8

30. In response to the letter and minimal number of documents produced, and in accordance with the FTA'S rules regarding appeal of a FOIA decision, counsel for SSE submitted an administrative appeal challenging the adequacy of FTA'S search, FTA's improperly withholding of documents and FTA's refusing to identify the categories of documents withheld or the basis for the withholding. SSE's counsel also pointed out that its due process rights were violated in that FTA made no appropriate description of the nature of documents withheld, type of documents withheld or the grounds by which they were withheld. SSE's counsel cited case law explaining that no privilege applies to communications between a federal agency and a state or county agency. A true and correct copy of SSE's appeal is attached hereto as **Exhibit C.**

31. Long after the 20 business days had run, FTA issued a decision denying the bulk of SSE's Appeal dated September 6, 2018. FTA upheld its decision and refusal to produce over four thousand documents. FTA continues to refuse to produce a Vaughn Index detailing the bases for withholding each of the documents being withheld. Instead FTA has claimed in a broad and improper fashion that all documents withheld are privileged. A true and correct copy of FTA'S Decision on SSE's Appeal dated September 6, 2018 is attached hereto as **Exhibit D**.

32. In addition, FTA is required to segregate any reasonable portion of the requested records and redact documents in response to a FOIA request. However, here there was no attempt to segregate/redact documents, rather, there was a wholesale refusal to comply. This is a violation of FOIA.

33. The FTA stated in its decision on SSE's administrative appeal that the basis for its withholding was FOIA Exemption 5, which protects from disclosure "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. §552(b)(5).

34. The definition of "agency" is limited, it means "each authority of the Government of the United States. VTA, of course, is not a department of the Federal Government and thus Exemption 5 does not apply. Therefore, FTA resorted to the fiction of

claiming that VTA serves as its consultant to try and cram VTA into FTA's deliberative process privilege.

35. The United States Supreme Court approved the Ninth Circuit Court of Appeals explanation of who qualifies as a consultant under Exemption 5. VTA cannot qualify as a consultant under the U.S. Supreme Court and Ninth Circuit Court of Appeal criteria. *Department of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1 (2001) ("*Klamath*") A consultant does not represent its own interest, or the interest of any other client, when it advises the agency that hires it. Its only obligations are to truth and its sense of what good judgment calls for, and in those respects it functions just as an employee would be expected to do. (*Id*. at 10-11.) VTA is an applicant and competitor and adverse to the other New Starts claimants. VTA has the interests of VTA and Santa Clara County in mind as guided by the local politicians that make up its Board of Directors. Moreover, even if there were no rivals for FTA New Starts funding, VTA would be pressing its own views as it applies to VTA seeking the New Start $1.4 Billion program funding. (*Id*.at p. 14.)

36. The next key question in determining if Exemption 5 applies is whether the material is deliberative in nature. An agency withholding information, "must establish 'what deliberative process is involved, and the role played by the documents in issue in the course of that process.'" (*Senate of P.R. v. U.S. Dep't of Justice*, 823 F.2d 574, 585–86 (D.C. Cir. 1987)). This FTA has not done. It is not enough to say that the documents relate, in some way, to the subject of the agency decision, because if they did not, the documents would not be before the court at all. (*Judicial Watch, Inc. v. U.S. Postal Serv.*, 297 F.Supp.2d 252, 264 (D.D.C. 2004)).

37. Importantly, "[T]he timing of a record is important in the analysis; communications <u>made after a decision has been made</u> and designed to explain that decision are not privileged under Exemption 5." (*Nat'l Right to Work Legal Def. & Educ. Found., Inc. v. U.S. Dep't of Labor*, 828 F.Supp.2d 183, 189 (D.D.C. 2011)) (Emphasis added) Since the decision to eliminate parking at Diridon was made prior to 2016 there is no basis for withholding the thousands of relevant post 2016 documents.

///

**STATUTORY BACKGROUND**

38.     FOIA requires that an agency disclose records to any person except where the records fall under a specifically enumerated exemption. (5 U.S.C. §552.)  The courts have emphasized the narrow scope of these exemptions and "the strong policy of FOIA that the public is entitled to know what its government is doing and why." (*Coastal Sates Gas Corp v. Dep't of Energy*, 617 F2d 854, 868 (D.C. Cir. 1989).)

39.     FOIA requires that an agency, upon any request for records, shall make the records available promptly.  (5 U.S.C. §552(a)(3)(A).)  An agency shall make a determination whether to comply with a request within twenty (20) business days after the receipt of the request.  (5 U.S.C. §552(a)(6)(A(i).)  In unusual circumstances, the agency may extend the time for the determination, for no more than ten (10) days.  (5 U.S.C. §552(a)(6)(B)(i).)

40.     An agency's process for dealing with FOIA requests constitutes "withholding" if its net effect is to significantly impair the requesters' ability to obtain the records or significantly increase the amount of time he or she must wait to obtain them. *(McGehee, III v. Central Intelligence Agency*, 697 F.2d 1095, 1110 (D.C. Cir. 1983), vacated in part on other grounds, 711 F.2d 1076 (1983).)

41.     Federal agencies are under a duty to conduct a reasonable search for records responsive to a party's request using methods that can be reasonably expected to produce the information requested to the extent they exist.  (5 U.S.C. §552(a)(3)(C).)

42.     When an agency decides to withhold records under a claim of exemption it must notify the person making such request of such determination and the reasons therefor.  (5 U.S.C. §552(a)(6)(A)(i).)

43.     On June 30, 2016, President Obama signed into law the FOIA Improvement Act of 2016.  The Act made significant amendments to FOIA, effective as of enactment on June 30, 2016. (5 U.S.C. §552, §6; OIP Summary of the FOIA Improvement Act of 2016.)  The amendments include changes to the standard by which FTA must evaluate withholdings.  The FOIA Improvement Act of 2016 dictates that agencies shall withhold information <u>only</u> if disclosure would harm an interest protected by an exemption – what is referred to as the

"foreseeable harm standard." (5 U.S.C. §552(a)(8)(A)(i); OIP Summary of the FOIA Improvement Act of 2016.)

44. Additionally, FOIA requires an agency to consider partial disclosure whenever the agency determines that a full disclosure of a requested record is not possible and to take reasonable steps necessary to segregate and release nonexempt information. (5 U.S.C. §552(a)(8)(A).)

45. Having exhausted all administrative remedies, SSE now seeks injunctive and other appropriate relief.

## FIRST CLAIM FOR RELIEF

(Violation of FOIA, 5 U.S.C. Section 552)

46. SSE hereby incorporates by reference and realleges each and every allegation set forth above.

47. FTA is subject to FOIA and must therefore release, in response to a FOIA request, any disclosable records in its possession and provide a lawful reason for withholding any materials to which it is claiming an exemption.

48. FTA has no lawful basis for declining to fully search for and release its records requested by SSE under FOIA.

49. SSE is entitled to declaratory and injunctive relief compelling the release and disclosure of the requested records. SSE is also entitled to FTA timely providing an appropriate description of the nature of documents withheld, the type of documents withheld and the legal basis for the withholding.

## SECOND CLAIM FOR RELIEF

(Violation of FOIA Requirement to Release Documents Unless a Valid Exemption)

(5 U.S.C. §§ 552(a)(8)(A), 552(a)(6)(A)(i) and 552(a)(3)(A))

50. SSE hereby incorporates by reference and realleges each and every allegation set forth above.

51. FTA has violated 5 U.S.C. §§552(a)(8)(A) by withholding documents under invalid and unjustified claims of exemption under 5 U.S.C. §§552(b)(5). FTA may not

withhold documents unless foreseeable harm will occur to an interest protected by an enumerated exemption. (5 U.S.C. §§552(a)(8)(A)(i).) FTA has not shown that such foreseeable harm exists. FTA has also violated 5 U.S.C. §§552(a)(8)(A)'s mandate that FTA segregate and release non-exempt information. FTA has failed to produce the entire contents of 4365 pages of information under the deliberative process exemptions without an adequate showing that the FTA attempted to segregate and release the non-exempt information in these pages.

52. FTA has also violated FOIA by failing to comply with the 5 U.S.C. §552(a)(6)(A)(i) requirement that the agency provide enough information, presented with sufficient detail, clarity, and verification, so that the requester can fairly determine what has not been produced and why. Exemptions are read narrowly, and FTA bears the burden of proving exemptions apply, which it has failed to do. (5 U.S.C. §552(a)(4)(b).)

## **PRAYER FOR RELIEF**

53. WHEREFORE, Sharks Sports & Entertainment LLC respectfully requests the Court:

(1) Order Defendant, by a date certain, to conduct a search that is reasonably likely to lead to the discovery of any and all records responsive to SSE's request;

(2) Order Defendant, by a date certain, to demonstrate that it has conducted an adequate search;

(3) Order Defendant, by a date certain, to produce to SSE any and all non-exempt records, or portions of records, responsive to SSE's request, as well as a *Vaughn* index of any records, or portions of records, withheld due to a claim of exemption;

(4) Enjoin Defendant from improperly withholding records responsive to SSE's request;

(5) Order Defendant to produce any and all records withheld from disclosure to the court for *in camera* review pursuant to 5 U.S.C §552(a)(4)(B);

(6) Grant SSE an award of attorneys' fees and other reasonable litigation costs pursuant to 5 U.S.C. §552(a)(4)(E); and

///

---

(7) Grant SSE such other relief as the Court deems appropriate.

Dated: September 28, 2018     SILICON VALLEY LAW GROUP

By: /s/ Edward A. Kraus_____
    Edward A. Kraus, Attorneys for
    Sharks Sports & Entertainment LLC